ORION BROADCASTING, INC.,
Plaintiff,

v.

Melissa FORSYTHE, Defendant.

No. C 79–0503–L(B).

United States District Court,
W. D. Kentucky,
Louisville Division.

Petition for Removal Sept. 26, 1979.

Decided Oct. 5, 1979.

Marshall P. Eldred, Louisville, Ky., for plaintiff.

Edgar A. Zingman, Louisville, Ky., for defendant.

MEMORANDUM CONTAINING
FINDINGS OF FACT AND
CONCLUSIONS OF LAW

BALLANTINE, District Judge.

Melissa Forsythe was employed by Orion Broadcasting, Inc. in 1972. She was originally employed as a television news reporter and at some later date she became a news anchor—first on weekends and then later on the station's two daily prime-time news programs—one at 6:00 p. m. and one at 11:00 p. m.

On July 25, 1978 Ms. Forsythe executed an employment agreement, Paragraph 11 of which reads as follows:

"*No Competition.* WAVE and the Employee have agreed that listeners, to a substantial extent, identify the Stations with the persons who appear in or speak in broadcasts by the Stations, and that the Employee's participation in broadcasts by any station competing with the Stations would create confusion, deprive the Stations of a part of their goodwill and audience following and thus subject WAVE to irreparable damage for which it would have no adequate remedy in damages. Accordingly, the Employee has agreed that, except with WAVE's prior written consent, the Employee will not, during the twelve (12) months immediately following any termination or expiration of this Agreement, appear or speak ("live" or by tape, film or other recording) in (a) any broadcast by any television station whose Grade B contour overlaps more than 10 percent of the Grade B contour of television station WAVE–TV,

or (b) any broadcast by any radio station whose FCC license permits location of its transmitter within the Louisville, Kentucky, standard metropolitan statistical area as defined by the Bureau of the Census at the time of execution of this Agreement."

Apparently, in late 1978 and early 1979 Orion's Louisville television station, WAVE-TV, began to lose a substantial number of its viewers to WHAS-TV, another Louisville television station. Whether the fall in the rating was brought about by an increase in audience appeal of the WHAS news team or general disenchantment with the WAVE news team may be a matter of some conjecture. At any rate, WAVE determined in July, 1979, that it was in a position which dictated a radical change in its news programming. Ms. Forsythe and her co-anchor, Mr. Cullen, were notified that their employment contracts would be terminated under the provisions of Paragraph 5(b) of the employment agreement, which read: "WAVE may terminate this agreement— * * * (b) upon the first day of any calendar quarter during the term by giving not less than sixty (60) days prior written notice to the employee." Upon receipt of the notice that her contract would be terminated, Ms. Forsythe asked her superiors at WAVE to prepare and send specimen video tapes to other outlets.

Pursuant to this request, WAVE sent at least one tape, and maybe two tapes, to other outlets, including NBC News. NBC News responded that it was not interested in employing Ms. Forsythe. Ms. Forsythe then asked WAVE to release her immediately from the employment agreement and she was released.

After her release, Ms. Forsythe met with WHAS-TV and executed a contract covering a three-year period, under the terms of which she was to serve as a television news reporter. Under the contract she might also have been responsible for anchoring, co-anchoring, producing newscasts, participating in public affairs programs, promotion of news and public affairs programs and station activities. WHAS agreed that Ms. Forsythe could terminate the agreement by giving it four (4) weeks written notice. Should she have elected to terminate the agreement she would have been prohibited from accepting employment with any station owned by the parent companies of WLKY-TV and WAVE-TV for a period of one year.

Upon learning of Ms. Forsythe's contract with WHAS, Orion instituted this action in the Jefferson Circuit Court, seeking to restrain her appearing on WHAS and asserting that any appearance would violate Paragraph 11 of the contract set out above.

Ms. Forsythe, a resident of Indiana, removed the action to this Court, and on September 28, 1979, the Court entered a temporary restraining order, the substance of which prevented Ms. Forsythe from appearing or speaking on any television or radio station within the geographical limits set out in the Order. The matter was then assigned to October 3 for a hearing on plaintiff's motion for a preliminary injunction.

At the conclusion of plaintiff's proof, the Court found that plaintiff was not entitled to preliminary injunction and notified counsel that appropriate findings of fact and conclusions of law would be entered.

At the hearing on the motion for preliminary injunction, plaintiff introduced the testimony of its Vice-President, Lee Browning. Mr. Browning traced Ms. Forsythe's employment history with WAVE and testified that in January, 1979, he became aware that the WAVE news team of Ms. Forsythe and Mr. Cullen was losing its audience. He testified that the station received complaints from viewers and he met with his staff in an effort to resolve the problem. He testified that he talked with Ms. Forsythe and that her complaint was that Mr. Cullen was not a competent reporter. There was some testimony from Mr. Browning concerning a charge by Ms. Forsythe that Mr. Cullen may have had a drinking problem. (The Court finds that there is not sufficient evidence to justify any further comment on whether Ms. Forsythe made such a charge or whether the

charge, if made, were in fact true.) Mr. Browning encouraged Ms. Forsythe to change her attitude toward Mr. Cullen, at least while they were on the air. Mr. Browning further testified that research done by their research department indicated that the viewing public was aware that some problem existed between Ms. Forsythe and Mr. Cullen.

Mr. Browning testified at length as to the promotional expenses which WAVE had incurred in developing Ms. Forsythe into a popular personality. He estimated the total cost to WAVE for its promotion of Ms. Forsythe to be almost $2,000,000.00.

At the time Ms. Forsythe was terminated, there was no discussion with her about another position with WAVE under its collective bargaining agreement with the American Federation of Television and Radio Announcers.

Plaintiff also introduced the evidence of Thomas NcNulty, Director of Research for Orion. Mr. McNulty testified that in February and March of 1979, his department made a "major news analysis" and came to the conclusion that Ms. Forsythe was beginning to alienate the news audience.

Plaintiff also introduced the testimony of James M. Keeler, former News Director of WAVE. Mr. Keeler made some intemperate remarks concerning Ms. Forsythe's future, the substance of which was that while male news announcers achieve greater credibility with age, female news anchors tend to lose credibility with age. Whether this remark has any foundation in fact is of no moment for purposes of this Memorandum. Mr. Keeler indicated that, in his judgment, Ms. Forsythe had a productive work life as a news anchor of no longer than 2 more years.

Plaintiff also introduced the testimony of Larry Pond, the present News Director at WAVE. His testimony concerning the relationship between Ms. Forsythe and Mr. Cullen confirmed that offered by Mr. Browning and Mr. Keeler. He testified about 2 other newscasters for WAVE who had left to go to other stations. Mr. Jon Esther had left WAVE and gone to a television station in Evansville, Indiana, the Grade B Contour of which overlapped more than 10% of the Grade B Contour of WAVE–TV. Mr. Pond admitted that WAVE had taken no action against Mr. Esther to enforce Paragraph 11 of the employment agreement.

Mr. Pond also testified that Mary Ann Childress, a newscaster for WAVE, had left the station and taken a position with a television station in Indianapolis. Although there was an overlapping of the Grade B Contours, WAVE took no action against Ms. Childress.

Plaintiff finally introduced the testimony of Stephen Cagle, who testified at great length about his work as a market researcher for Frank Magid & Associates. He drew the conclusion that WAVE would suffer irreparable harm in the event Ms. Forsythe began to appear on WHAS–TV. While his testimony was informative as to the method of determining the impact of television stations on the public, the Court is of the opinion that it is too speculative to justify a finding that WAVE would in fact suffer irreparable harm from Ms. Forsythe's activities

### CONCLUSIONS OF LAW

1. The Court has jurisdiction of this action under Title 28 U.S.C. Sections 1332 and 1441.

2. Since this is a diversity action, the Court must look to the substantive law of Kentucky to determine the issues raised. *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

3. Injunctive relief is an extraordinary remedy and ought to be exercised with great caution, deliberation and sound discretion. *Detroit Newspaper Publishers Assoc. v. Detroit Typographical Union No. 18, International Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972).

4. The covenant between Ms. Forsythe and Orion lack mutuality. In *Crowell v. Woodruff*, Ky., 245 S.W.2d 447 (1951), the Court said:

"The instant covenant is of dubious quality. There seems to be a lack of mutuality, for there is no corresponding or fair reciprocal obligation on the part of the employer. He did not bind himself to continue Crowell in his employment longer than thirty days, yet the employee bound himself to surrender his life trade in his home community for a period of one year."

It requires no judicial interpretative gymnastics to demonstrate the applicability of this language to the case before the Court.

5. Plaintiff's reliance on *Lareau v. O'Nan*, Ky., 355 S.W.2d 679 (1962), is misplaced. In *Lareau* the Court enforced a non-competition covenant between a physician and a clinic in Henderson, Kentucky, the effect of which was that, in the event of a termination, the physician would not engage in the practice of medicine in Henderson County for a period of 5 years. The Court distinguished *Crowell* and said:

"Here, however, the services Lareau is qualified to render are of a character for which there is an extremely favorable seller's market. It is a matter of common knowledge that there is a general nationwide demand for doctors and in almost any community a doctor can earn a handsome income. The wide gates of opportunity for Lareau are open throughout the nation and the mere fact that the door of Henderson County is closed to him can cause no such injury to him as to arouse the compassion of a court of equity."

This language is clearly inapplicable to Ms. Forsythe's situation. She is not in a seller's market, there is no nationwide demand for news anchors and she cannot earn a handsome income in almost any community. We believe that the language in *Calhoun v. Everman*, Ky., 242 S.W.2d 100 (1951), expresses the Court's view of this contract: "The modern philosophy of the law is that a man may sell his services but not himself . . . . ."

6. Plaintiff, after first arguing, and properly so, that the law of Kentucky should be applied to this controversy, has furnished the Court with authorities from Ohio, Alabama and Illinois. While the Court is not persuaded by these authorities, it should be pointed out that in *Skyland Broadcasting Corp. v. Hamby*, 141 N.E.2d 783 (Ohio Com.Pl.1957), replied on by plaintiff, the Court said at page 785: "The true test in this situation is the factual manner in which the employment is severed." We believe that that language is applicable here.

7. The Court finds that *Hall v. Willard & Woolsey, P. S. C.*, Ky., 471 S.W.2d 316 (1971), is also inapposite since in *Hall* the employee had voluntarily severed her connection with the clinic. In the case now before this Court had Ms. Forsythe voluntarily severed her relationship with plaintiff, the Court has no doubt that the non-competition covenant would have been enforceable against her. To hold that Ms. Forsythe, at the whim of plaintiff, could be deprived of her livelihood in a highly competitive market, seems to the Court to be an example of industrial peonage which has no place in today's society. *Josten's Inc. v. Cuquet, Sr.*, 383 F.Supp. 295, 299 (E.D.Mo., 1974).

8. The temporary restraining order entered herein September 28 will be hereby dissolved, plaintiff's motion for preliminary injunction will be hereby denied, and this action will be dismissed.